UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,                    Case No. 21-cr-160 (WMW/LIB)

            Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

Antoine Marcell Fickas (1),
Lizabeth Ann Skarja (2),

            Defendants.

---

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Antoine Marcell Fickas' Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 48], and Defendant Lizabeth Ann Skarja's Motion to Suppress Evidence Obtained as a Result of Search and Seizure. [Docket No. 52].

At the Motions Hearing regarding Defendants' Motions to Suppress, the parties requested, and were granted, the opportunity to submit supplemental briefing. Upon the completion of that briefing, Defendants' Motions to Suppress, [Docket Nos. 45, 52], were taken under advisement.

For reasons discussed herein, the Court recommends that Defendant Fickas' Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 48], be **GRANTED**, and Defendant Skarja's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 52], be **GRANTED**.

I.       **Background and Statement of Facts**

   **A. Background**

   Defendant Fickas is charged with one (1) count of conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, as well as, one (1) count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). (Indictment [Docket No. 1]). Defendant Skarja is also charged with one (1) count of conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, as well as, one (1) count of possession with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). (Indictment [Docket No. 1]).

   **B. Facts**[1]

   On April 20, 2021, at approximately 1:48 a.m., Officer Joe Burns (hereinafter "Officer Burns") with the Hibbing Police Department was approaching a roundabout in his marked patrol vehicle in Hibbing, Minnesota with his canine partner, Chase. (Tr. 4–13, 16).[2] As he approached the roundabout, Officer Burns observed a dark-colored GMC Acadia. (Tr. 14). As Officer Burns was about to enter the roundabout, the Acadia exited the roundabout going past Officer Burns' patrol vehicle. (Tr. 15–16). As the Acadia drove past Officer Burns, he observed a male driver with his arm extended upward to the steering wheel. (Tr. 15–17, 91). The male driver's raised arm partially blocked his face. (Tr. 15–16). After he passed the Acadia, Officer Burns could see the license plate number of the Acadia. (Tr. 14).

---

[1] The facts contained in this section are derived from the testimony of Officer Joe Burns at the November 5, 2021, Motions Hearing, as well as, the parties' exhibits admitted in this case.
[2] Throughout this Report and Recommendation, the Court refers to the transcript of the November 5, 2021, Motions Hearing by the abbreviation "Tr." (Transcript [Docket No. 60]).

Officer Burns recognized the license plate number as belonging to Kaycee Johnson, and he verified that information on his in-vehicle computer. (Tr. 17). Officer Burns had previous encounters with Ms. Johnson, and he had also had previous encounters with Ms. Johnson's then boyfriend, Justin Lemmons. (Tr. 17–20). Officer Burns knew Mr. Lemmons from "numerous" previous traffic stops and from previous incidents during which Mr. Lemmons fled from law enforcement. (Tr. 17–20). Officer Burns also knew, and verified on his in-vehicle computer, that there was an existing Domestic Abuse No Contact Order issued by the Minnesota State Court which prohibited Ms. Johnson and Mr. Lemmons from being in close proximity to one another. (Tr. 17–20). Officer Burns was also aware that Mr. Lemmons was known to drive even when his driver's license had ben revoked. (Id.).

With this information, Officer Burns executed a U-turn to begin travelling behind the GMC Acadia. (Tr. 20–25). While driving behind the vehicle, Officer Burns observed the Acadia's brake lights momentarily activate as the Acadia drove through an intersection with a green light. (Id.). The driver then activated the Acadia's left-hand turn signal, but the Acadia did not turn. (Id.). Instead, the vehicle drove approximately 200 yards before deactivating its turn signal. (Id.). The Acadia then moved to the right-hand lane of the roadway. (Id.).

Officer Burns approached the Acadia by driving in the left-hand lane while the Acadia drove in the right-hand lane. (Id.). Officer Burns observed that the male driver had a goatee, a tattoo on his neck, and tattoos covering his arms. (Id.). Officer Burns believed the male driver was Mr. Lemmons because Mr. Lemmons "has goatee-style facial hair, neck tattoos, and full arm sleeves." (Id.). Officer Burns also observed a female passenger in the front seat. (Id.). Although Officer Burns could not identify the female passenger, he believed it was Ms. Johnson because

she was known to closely associate with Mr. Lemmons and the Acadia was registered to her. (Id.).

Upon making these observations, Officer Burns changed lanes to drive behind the Acadia. (Tr. 26–32). As Officer Burns began positioning his patrol vehicle behind the Acadia, the Acadia activated its right-hand turn signal. (Id.). The Acadia turned right onto Howard Street East travelling in an eastward direction. (Id.). Officer Burns turned right to follow the Acadia onto Howard Street East. (Id.).

Upon turning onto Howard Street East, Officer Burns initiated a stop by activating his vehicle's emergency lights. (Tr. 27–30). Officer Burns testified generically that during this time he observed the Acadia's occupants engaging in "furtive movements." (Id.). After Officer Burns activated his emergency lights, the driver of the Acadia applied the vehicle's brakes to slow the vehicle, and the driver pointed his arm out of the window in a manner which Officer Burns described as indicating the driver was pulling over into the Southview Apartments. (Tr. 27–30, 77). The Acadia pulled into the Southview Apartments, and the driver parked the Acadia in a parking spot. (Tr. 27–30). Officer Burns brought his vehicle to a stop behind the Acadia. (Tr. 27–30).

After stopping, Officer Burns exited his vehicle, and he verbally commanded the driver to show his hands through the open window of the Acadia. (Tr. 30–33). The driver complied with Officer Burns' commands, and Officer Burns began to approach the Acadia to remove the driver from the vehicle. (Id.). As Officer Burns was approaching the Acadia, other officers began arriving on the scene. (Id.).

Once he had approached the Acadia, Officer Burns "immediately recognized that" the driver was not Mr. Lemmons as Officer Burns had believed. (Tr. 33, 78). Officer Burns did not

know the identity of the driver. (Tr. 34–36). The female passenger was also not the registered owner of the vehicle, Ms. Johnson, as Officer Burns had assumed. (Tr. 17, 37). Officer Burns asked the driver, who would later be identified as Defendant Fickas, to exit the Acadia. (Id.). Defendant Fickas complied. (Id.). Defendant Fickas provided his name and date of birth to Officer Burns, and Officer Burns verified Defendant Fickas' identity. (Id.). Officer Burns handcuffed Defendant Fickas, and Defendant Fickas was placed in the back seat of Officer Burns' patrol vehicle. (Tr. 81).

During the interaction between Officer Burns and Defendant Fickas, other officers on the scene approached the passenger's side of the Acadia. (Tr. 36–44). Officer Burns testified that he heard those other officers "struggling" to get the passenger out of the vehicle. (Id.). The passenger was later identified as Defendant Skarja. (Id.). While removing Defendant Skarja from the vehicle, the officer opened the front passenger's side door where Defendant Skarja was seated. (Id.). The officers, while standing outside the vehicle, purportedly observed a glass smoking device in the map pocket of the open door, (Id.), and they informed Officer Burns of the smoking device. (Id.). Without offering any details as to why, Officer Burns testified that he believed the smoking device may have been used to ingest methamphetamine. (Id.). Officer Burns also observed "multiple bags" in the front passenger seat area which he found to be suspicious because the Acadia was a sport-utility vehicle with some unused rear storage room visible. (Id.).

Officer Burns then deployed his canine partner, Chase, for a vehicle sniff. (Tr. 44–50). Chase was placed on a leash, and Officer Burns led Chase around the vehicle starting near the hood of the vehicle and moving toward the driver's side of the vehicle. (Id.). At the area of the

Acadia between the driver's door and the rear passenger door, Chase alerted to the presence of the odor of narcotics, and he gave a final indication. (Id.).

Based on Chase's alert, the officers then searched the interior of the Acadia without a warrant and while the vehicle was still in the parking lot. (Id.). The officers searched all of the Acadia except for inside "several" bags located in the "trunk area" of the Acadia. (Tr. 47–51). During this on scene search of the Acadia, law enforcement officers located micro-baggies; three pounds of suspected methamphetamine; approximately thirteen grams of suspected heroine; scales, including a scale with white powder residue on it which tested positive for methamphetamine; "loaded" hypodermic needles; and a silicon container with a crystal substance that later tested positive for methamphetamine. (Id.). The Acadia was then towed to the police garage. (Id.).

After the on scene parking lot search of the Acadia, Officer Steve Dolinich with the Hibbing Police Department submitted an application for a search warrant authorizing law enforcement to search the Acadia. (Gov't Ex. 1).[3] In support of this application, Officer Dolinich submitted an affidavit containing the information detailed above. (Id.). The affidavit also provided a summary of statements Defendant Skarja made to Officer Burns at the Hibbing County Police Department. (Id.).

The Honorable Rachel C. Sullivan, District Court Judge for the State of Minnesota, Sixth Judicial District, County of St. Louis, determined that probable cause existed to support the issuance of the April 20, 2021, Search Warrant. (Id.). The April 20, 2021, Search Warrant authorized law enforcement officers to search the Acadia. (Id.).

---

[3] Government's Exhibit 1 is the warrant application, supporting affidavit, and warrant authorizing the search of the Acadia, as well as, the completed search warrant return. At the Motions Hearing, the Government, without objection, offered the warrant application, supporting affidavit, warrant, and completed search warrant return into evidence as Government's Exhibit 1. (Tr. 54).

Thereafter, law enforcement officers, including Officer Dolinich, executed the April 20, 2021, Search Warrant. (Id.). As a result of this subsequent search, Officer Dolinich located several additional items of interest, including cellular telephones and brass knuckles. (Id.).

## II.    Defendants' Motions to Suppress. [Docket Nos. 48, 52].[4]

Defendants seek to suppress all evidence flowing from the stop and search of the GMC Acadia. In support of this request, Defendants argue that the initial stop of the GMC Acadia was unsupported by sufficient articulable suspicion; the April 20, 2021, stop was impermissibly extended after Officer Burns determined that the driver was not Mr. Lemmons; the stop was further impermissibly extended to allow for the canine vehicle sniff; and therefore, the search of the GMC Acadia at the end of the vehicle stop was constitutionally impermissible. (Defs.' Mem. [Docket No. 63]). Defendants also argue that if the unconstitutionally obtained evidence is removed from the affidavit in support of the April 20, 2021, Search Warrant for the Acadia, then the April 20, 2021, Search Warrant is not supported by probable cause. (Id.).

### A.  Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." United States v. Davis, 569 F.3d 813, 816 (8th Cir. 2009) (citing Katz v. United States, 389 U.S. 347, 357 (1967)); see, United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001).

---

[4] Defendants submitted a joint memorandum, and their Motions to Suppress are substantive identical. The Court thus discusses the Motions simultaneously.

**B. April 20, 2021, Traffic Stop and On Scene Warrantless Search of the GMC Acadia**

Roadside traffic stops constitute seizures for the purposes of the Fourth Amendment. See, e.g., Delaware v. Prouse, 440 U.S. 648, 653 (1979). To be lawful, a traffic stop must be supported by at least a reasonable, articulable suspicion that a crime is being committed. See, e.g., Jones, 269 F.3d at 924; Prouse, 440 U.S. at 663; United States v. Martin, 411 F.3d 993, 1000 (8th Cir. 2005); United States v. Houston, 548 F.3d 1151, 1153 (8th Cir. 2008); United States v. Travis, No. 14-cr-253 (DSD/SER), 2015 WL 439393, at *1, 11 (D. Minn. Feb. 3, 2015); United States v. Maurstad, No. 18-cr-300 (1) (SRN/KMM), 2019 WL 4863451, at *3 (D. Minn. Aug. 21, 2019), report and recommendation adopted, 2019 WL 4862029 (D. Minn. Oct. 2, 2019); United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002).

Once a stop has been lawfully initiated, the officer is entitled to conduct an investigation, however, the scope of the investigation must be reasonably related to the circumstance which give rise to the stop. Rodriguez v. United States, 575 U.S. 348, 353 (2015). A court reviewing the validity of an initial stop examines whether an officer's actions were objectively reasonable under the circumstances known to the officer at the time. United States v. Smart, 393 F.3d 767, 770 (8th Cir. 2005).

**1. Initial Stop of GMC Acadia on April 20, 2021**

The Government argues that Officer Burns' initial stop of the GMC Acadia was supported by reasonable, articulable suspicion. (Gov't Mem. [Docket No. 66] at 10–11). Specifically, the Government contends that Officer Burns had reasonable, articulable suspicion because he believed the driver of the GMC Acadia was in violation of a Minnesota state court Domestic Abuse No Contact Order; because of the Acadia's "erratic driving"; because at the roundabout "the driver was holding his left arm straight out as if to conceal his face from police

scrutiny"; and because Officer Burns observed "furtive movements during the course of the stop." (Id. at 6, 10–11).[5]

During the Motions Hearing, Officer Burns generically testified that he observed "furtive movements" from the Acadia's occupants, and he explained that he observed these "furtive movements" through the sideview mirror of the Acadia. (Tr. 29, 92–94).[6] Officer Burns described the "furtive movements" as only that he "observed the occupants both moving around within the vehicle as they were looking back at [him] and looking around." (Tr. 29).

Officer Burns' generic description of "furtive movements" is insufficient to establish a reasonable, articulable suspicion under the circumstances of the present case. Officer Burns' reliance on generalized, unspecified movements by a vehicle's occupants lends no credence to the establishment of reasonable, articulable suspicion even when consider under the totality of the circumstances. As the Eighth Circuit Court of Appeals has repeatedly recognized, the consideration of reasonable, articulable suspicion is "fact specific, requiring the government to establish that the officer had 'a particularized and objective basis for suspecting the particular person stopped of breaking the law.'" United States v. McLemore, 887 F.3d 861, 865 (8th Cir. 2018) (quoting Heien v. North Carolina, 574 U.S. 54, 60 (2014)) (emphasis added). Here, Officer Burns' description of general movement within the Acadia is anything but particularized, and therefore, is no objective basis upon which to base an investigation. See, United States v.

---

[5] At the November 5, 2021, Motions Hearing, Officer Burns testified that he believed he had reasonable, articulable suspicion to stop the GMC Acadia, in part, because the driver of the Acadia activated the vehicle's turn signal but failed to turn. (Tr. 75; see, Tr. 22 (providing Officer Burns' testimony, "[t]he turn signal law, once you activate your turn signal, you must exit the nearest turn")). The Government no longer proffers this argument. (See, Gov't Mem. [Docket No. 66]). Officer Burns' belief that Minnesota state law requires a driver to turn every time a vehicle's turn signal is activated is an unreasonable mistake of law, and it cannot support or contribute to the formation of reasonable, articulable suspicion. See gen., United States v. McLemore, 887 F.3d 861, 867 (8th Cir. 2018); United States v. Sanders, 196 F.3d 910, 913 n.3 (8th Cir. 1999).

[6] Although Officer Burns testified that he could see through the open driver's window as he approached the Acadia on foot and he also testified that a person could see through the glass at the back of the Acadia, the only testimony from Officer Burns on how he saw the "furtive movements" is his testimony that he saw them through the "driver's sidemirror." (Tr. 92).

Beck, 140 F.3d 1129, 1139 (8th Cir. 1998) (collecting cases). To hold otherwise would eviscerate the "articulable" requirement of reasonable, articulable suspicion.

Moreover, as the Eighth Circuit Court of Appeals has highlighted, "[i]t certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer." United States v. Beck, 140 F.3d 1129, 1139 (8th Cir. 1998) (quoting United States v. Wood, 106 F.3d 942, 947 (10th Cir. 1997) ("It is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer.")). Furthermore, the weight to be assigned Officer Burns' testimony about the existence of "furtive movements" by both the driver and the passenger is greatly diminished by his testimony that he saw these movements through only the Acadia's driver sidemirror as he was walking up to the vehicle.

The Government also argues that Officer Burns had reasonable, articulable suspicion to stop the GMC Acadia based on the Acadia's "erratic driving." (Gov't's Mem. [Docket No. 66] at 11). In support of this characterization of "erratic driving," the Government notes that Defendant Fickas very briefly applied the brakes of the Acadia while driving through a green traffic light and activated the left-turn signal again briefly without turning. (Id.). This is far from "erratic driving," and the Government has failed to highlight any Court which has classified such driving as "erratic driving," justifying a traffic stop by law enforcement. The Government's characterization of "erratic driving" here overstates the record now before the Court.

That the Acadia's brake lights briefly illuminated, signifying that Defendant Fickas applied the brakes to some limited degree, is entirely consistent with the plethora of everyday, innocent drivers who intermittently apply a vehicle's brakes in order to control the speed of their

vehicle.[7] This is "entirely consistent with innocent travel such that, in the absence of contradictory information, it cannot reasonably be said to give rise to suspicion of criminal activity." See, United States v. Beck, 140 F.3d 1129, 1138 (8th Cir. 1998) (reaching the same conclusion in relation to "fast-food wrappers"). Officer Burns failed to offer any basis to support his supposition "from which any reviewing authority can gauge the reasonableness of his assumption." See, Id. Even when considered under the totality of the circumstances, the mere activation of a vehicle's brake lights for a momentary, unspecified amount of time, without something more, lends zero support to the development of reasonable, articulable suspicion of criminal activity.

The Court reaches the same conclusion regarding the brief activation of the Acadia's left-hand turn signal without the Acadia making a left-hand turn. A vehicle's driver is not required to turn after activation of a vehicle's turn signal, and such conduct is also entirely consistent with innocent travel. In addition, Officer Burns failed to proffer any explanation for his assumption that such conduct was indeed indicative of criminal activity.[8] Thus, the Government's claim of "erratic driving," even when considered with the totality of the circumstances, cannot demonstrate the reasonable, articulable suspicion to  necessary to support the stop of the GMC Acadia.

The Government also contends that Officer Burns had reasonable, articulable suspicion to stop the GMC Acadia because "the driver was holding his left arm straight out as if to conceal his face from police scrutiny." (Gov't Mem. [Docket No. 66] at 11). For the same reasons

_____

[7] Notable, Officer Burns testified only that he saw the Acadia's brake lights momentarily activate. (Tr. 20). Officer Burns did not testify on how long the brake lights were activated. Similarly, he did not testify that the application of the Acadia's brakes reduced the Acadia's speed in any appreciable unsafe or unreasonable manner. The testimony now before the Court establishes only that the Acadia's brake lights momentarily activated for a very brief, unspecified amount of time.

[8] Officer Burns testimony that he found the activation of the left-hand turn signal odd because there was no possible left-hand turn immediately available to the Acadia fails to cure this deficiency. There is still no indication as to how the activation of the Acadia's turn signal is indicative of any criminal activity.

discussed in relation to the Government's claim of erratic driving and under the circumstances of this case, the Court holds that any suspicion associated with the driver's arm being straight out and thereby concealing part of his face is, at best, di minimis.

The Court first notes that the Government's argument here fails to take into consideration Officer Burns testimony that the driver's arm was extended in the way it was because his hand was "on top of the steering wheel." (Tr. 64). The driver's arm was not merely raised to conceal his face as the Government's memorandum implies. Rather, Officer Burns observed the driver with his hand on the top of and controlling the steering wheel, and it was as likely that the angle at which Officer Burns viewed the driver as the two vehicles drove past one another causing the driver's arm to obscure part of the his face was coincidental as it was any attempt to conceal his face.

During the November 5, 2021, Motions Hearing, the Government's counsel asked Officer Burns, "in this instance, given the context of your meeting, you in the car going one way and the [Acadia] going the other way, you concluded that this man actually was trying to conceal his face?" (Tr. 16). Officer Burns responded, "Correct. That's what it appeared to be." (Tr. 16). Neither the Government nor Officer Burns elaborated as to any specific facts to support this conclusion. The record does not support this conclusion. At the time Officer Burns drove past the Acadia and saw the male driver with his left arm extended holding the top of the steering wheel, the only circumstance which had occurred was that he was driving past another vehicle. The Government's argument thus is that a law enforcement officer has reasonable suspicion to stop any vehicle which drives by said law enforcement officer if the driver's arm is extended to the top of the steering wheel thereby partially obscuring the driver's face. Even when the present

case is considered in the totality of the circumstances, this is plainly insufficient here on the present record.

Lastly, the Government argues that Officer Burns had reasonable, articulable suspicion to stop the Acadia because Officer Burns believed the male driver of the Acadia resembled Mr. Lemmons who was possibly violating a Domestic Abuse No Contact Order that included the female passenger issued by the Minnesota state courts. The Government acknowledges that Officer Burns' belief was based on a mistake of fact because the male driver was not Mr. Lemmons, but the Government argues that his mistake of fact was reasonable.

"An officer's mistake of law or fact may justify a stop so long as that mistake is objectively reasonable." United States v. Foster, 15 F.4th 874, 877 (8th Cir. 2021) (citing United States v. Hanel, 993 F.3d 540, 543 (8th Cir. 2021)). In the present case, Officer Burns was familiar with Mr. Lemmons from previous encounters, and Officer Burns testified that Defendant Fickas has several physical descriptors in common with Mr. Lemmons, including neck tattoos, full arm sleeve tattoos, and goatee style facial hair. (Tr. 23). Officer Burns also recognized, and verified, the Acadia as being registered to Ms. Johnson who Officer Burns knew to be closely associated with Mr. Lemmons and whom he thought may have been the female passenger. (Tr. 17–20). On this record, the Court finds objectively reasonable Officer Burns' mistake of fact that the driver of the Acadia was Mr. Lemmons. The physical indicators Officer Burns could observe of the driver seemed to match Mr. Lemmons, and the Acadia was registered to a female who was known to closely associate with Mr. Lemmons. It was objectively reasonable for Officer Burns to conclude that the male driver was Mr. Lemmons, even if that conclusion was ultimately incorrect.[9]

---

[9] Defendants take issue with Officer Burns' testimony that he saw the male driver's arm wase covered in tattoo sleeves because Officer Burns also testified that Defendant Fickas was wearing a hoodie at that time. Defendant

It was also reasonable for Officer Burns to conclude that the female passenger was Ms. Johnson. Although Officer Burns was unable to completely observe the female passenger well enough to get a physical description, the Acadia was registered to Ms. Johnson. Moreover, because it was objectively reasonable for Officer Burns to conclude that the male passenger was Mr. Lemmons, who was known to closely associate with Ms. Johnson and the Acadia was registered to Ms. Johnson, it was objectively reasonable for Officer Burns to believe that the female passenger may have been Ms. Johnson.

Officer Burns also knew, and verified on his in-vehicle computer, that there was an existing Domestic Abuse No Contact Order issued by the Minnesota state court which prohibited Mr. Lemmons and Ms. Johnson from being in close proximity to one another. (Tr. 17–20). Based on this knowledge, Officer Burns believed the male driver to possibly be in violation of a Minnesota state court Domestic Abuse No Contact Order. Officer Burns also knew that Mr. Lemmons' driver's license had been revoked, and Mr. Lemmons was known to continue to drive despite the revoked status of his driver's license. (Tr. 18).

In sum, before Officer Burns initiated the April 20, 2021, traffic stop, he had an objectively reasonable basis to believe that the male driver was Mr. Lemmons who was in violation a Minnesota state court Domestic Abuse No Contact Order, and Mr. Lemmons was driving the Acadia with a revoked driver's license. This demonstrates that there was reasonable, articulable suspicion that criminal activity was afoot warranting a Terry stop to further investigate. See, United States v. Miller, No. 19-cr-64 (MJD/ECW), 2020 WL 4060754, at *10 (D. Minn. May 19, 2020), report and recommendation adopted, 2020 WL 4059888 (D. Minn.

---

Fickas wearing a hoodie does not, however, necessarily contradict Officer Burns' testimony that he observed the male driver's tattooed left arm.

July 20, 2020). Thus, these circumstances represent reasonable, articulable suspicion to initiate the April 20, 2021, stop of the Acadia. See, Id.

For the reasons set forth above, the Court finds constitutionally permissible the initial stop of the Acadia on April 20, 2021.

### 2. Length of April 20, 2021, Initial Stop of the GMC Acadia

Defendants argue that even if the initial April 20, 2021, stop of the Acadia was constitutionally permissible, the stop was impermissible prolonged. In support of this contention, Defendants argue that Officer Burns lacked reasonable, articulable suspicion to extend the stop beyond the point when Officer Burns almost immediately realized the male driver was not Mr. Lemmons.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. It is well established that a roadside traffic stop is a "seizure" within the meaning of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653 (1979).

An officer may conduct an investigation reasonably related to the scope of a lawful stop. United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001). "Once this initial investigation is finished, however, the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, "'unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention[.]'" Id. at 925; see, United States v. Anguiano, 795 F.3d 873, 876 (8th Cir. 2015). Without reasonable suspicion, police may not extend an otherwise-completed traffic stop. See, Rodriguez, 575 U.S. at 353.

The question, here then, is whether Office Burns had a further reasonable, articulable suspicion to extend the April 20, 2021, stop other than the Domestic Abuse No Contact Order. If

he lacked reasonable, articulable suspicion to expand the scope of the investigation, then the extension of the stop would be unreasonable. See, Id. at 353–57 (holding that, absent reasonable suspicion, seven- or eight-minute extension of traffic stop in order to conduct drug sniff violated Fourth Amendment). If Officer Burns had reasonable, articulable suspicion to justify expanding the scope of the investigation, however, the extension of the stop would not violate the Fourth Amendment. See, e.g., United States v. Maltais, 403 F.3d 550, 556–58 (8th Cir. 2005); United States v. White, 42 F.3d 457, 460 (8th Cir. 1994). "A reasonable suspicion is 'some minimal, objective justification' for suspicion beyond an 'inchoate hunch.'" United States v. Davis, 943 F.3d 1129, 1132 (8th Cir. 2019) (quoting United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004)).

To establish reasonable suspicion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" further investigation. Terry v. Ohio, 392 U.S. 1, 21 (1968). The concept of reasonable suspicion is "not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213 (1983). Instead, when determining whether reasonable suspicion exists, Court must consider the totality of the circumstances. United States v. Woods, 747 F.3d 552, 556 (8th Cir. 2014).

As observed above, Defendants contend that, even if the initial stop was lawful, it became unlawful when Officer Burns unreasonably extended the stop past the point at which Officer Burns had almost immediately determined the driver was not Mr. Lemmons, and thus the driver was not in violation of the known Domestic Abuse No Contact Order. In support, Defendants rely heavily on Rodriguez v. United States, 575 U.S. 348 (2015). (See, Defs.' Mem. [Docket No. 63] at 4–7).

In <u>Rodriguez</u>, a canine-paired officer stopped Rodriguez for driving on the shoulder, a traffic violation. <u>Rodriguez v. United States</u>, 575 U.S. 348, 350–52 (2015). After the officer completed all tasks relating to the basis for the stop, he asked Rodriguez for permission to allow his dog to conduct a sniff-search of the exterior of Rodriguez's vehicle. <u>Id.</u> Rodriquez did not consent. <u>Id.</u> The officer then detained Rodriguez for approximately an additional seven minutes while he waited for a second officer to arrive, then retrieved his dog and conducted a sniff-search of the exterior of the vehicle, during which the dog indicated the presence of narcotics in the vehicle. <u>Id.</u> As a result, Rodriquez was indicted on narcotics charges. <u>Id.</u> He later moved to suppress the evidence gathered as a result of the stop. <u>Id.</u> The Magistrate Judge recommended that the motion be denied, concluding that although the officer did not have a reasonable articulable suspicion on which to prolong the stop after completing all tasks related to the initial stop, the seven-minute extension of the stop was a de minimis intrusion on Rodriguez's Fourth Amendment rights. <u>Id.</u> The district court and the Eighth Circuit agreed. <u>Id.</u> at 352–53. The Supreme Court, however, reversed, holding that the officer had been required to have a separate reasonable, articulable suspicion of criminal activity before he could extend the stop past the point at which he had completed all tasks related to the scope of the initial traffic stop. <u>Id.</u>

The present case is controlled by <u>Rodriguez</u> and the Eighth Circuit Court of Appeals cases applying <u>Rodriguez</u>. Applying this controlling precedent to the facts of this case, the Court finds that Officer Burns lack reasonable, articulable suspicion to extend the traffic stop beyond the moment in time when he almost immediately realized the male driver was not Mr. Lemmons.

As discussed above, Officer Burns had reasonable suspicion to stop the Acadia because he believed the male driver to be Mr. Lemmons and the female passenger to be Ms. Johnson; because if the driver was Mr. Lemmons and the passenger was Ms. Johnson, then Mr. Lemmons

was violating a Domestic Abuse No Contact Order; and because Officer Burns knew Mr. Lemmons' driver's license had been revoked. In other words, Officer Burns' reasonable suspicion hinged solely on the male driver being Mr. Lemmons. Officer Burns testified, however, that as he first approached the Acadia, he "immediately recognized" that the male driver was not Mr. Lemmons. (Tr. 33).

Officer Burns' only reasonable suspicion in support of the stop of the Acadia hinged on the male driver being Mr. Lemmons. At the exact point that Officer Burns almost immediately realized the male driver was not Mr. Lemmons, the purpose or scope of the initial investigatory stop had concluded. Officer Burns testified that he realized the male driver was not Mr. Lemmons as he was walking up to the Acadia and before he had even reached the driver's window. (Tr. 33). Once Officer Burns "realized that the individual associated with the" Domestic Abuse No Contact Order "was not present, he could not expand the scope of the investigation [or stop] on that ground." United States v. Collier, 419 F. App'x 682, 685 (8th Cir. 2011). Thus, to extend the stop past this instance, Officer Burns needed an additional, separate factual basis upon which to find reasonable, articulable suspicion of a different offense in need of further investigation.

No such separate reasonable, articulable suspicion exists here.

The Government argues that law enforcement officers had reasonable suspicion that criminal activity was afoot because when the officers removed Defendant Skarja from the passenger side of the vehicle they purportedly "observed in plain view a smoking device with a burned residue in the bowl." (Gov't Mem. [Docket No. 66] at 11). The law enforcement officers, however, attempted to remove Defendant Skarja from the vehicle and thus observed the "smoking device" after the purpose of the original stop had already ended. (See, Tr. 33, 36–37).

18

The other officers did not reach the car before Officer Burns, however, for the reasons discussed above, the purpose of the original stop had ended even before Officer Burns reached the driver's side door of the Acadia. To extend a traffic stop, law enforcement officers must develop and have separate reasonable, articulable suspicion of criminal activity before the completion of all tasks related to the initial traffic stop. Because the law enforcement officers here did not view the "smoking pipe" until <u>after</u> the completion of the purpose of Officer Burns' initial stop had already concluded, the removal of Defendant Skarja from the vehicle and the resulting observation of the purported "smoking pipe" inside the car, cannot be the basis for reasonable, articulable suspicion to extend the initial stop.[10]

The Government also implicitly argues that Officer Burns had reasonable suspicion to extend the traffic stop because when Officer Burns activated his emergency lights the Acadia "slowed down, but failed to stop for quite some time . . . ." (Gov't Mem. [Docket No. 66] at 11–12).[11] The Court finds this argument unpersuasive.

First, the Government's characterization that the Acadia "failed to stop for quite some time" is unsupported by the record. Officer Burns testified that he could not recall how long it took the Acadia to stop after he initiated his emergency lights. (<u>See</u>, Tr. 27–28). He testified only that he found it unusual that the Acadia did not "immediately" stop. (Tr. 28). When asked by Defense counsel to estimate the time it took the Acadia to stop, Officer Burns testified that it was "[p]robably somewhere in between" "a matter of seconds" and "a matter of minutes . . . ." (Tr. 28).

---

[10] This temporal requirement is also fatal to the Government's argument that Defendant Skarja's uncooperative conduct may somehow support reasonable suspicion, as well as, the Government's argument related to the "luggage" that law enforcement officer observed at the feet of Defendant Skarja in the passenger's side of the Acadia. Neither of these circumstances occurred until <u>after</u> the initial purpose of Officer Burns' stop had ended.

[11] The Government also argues that reasonable, articulable suspicion exists based on the "erratic driving" and Defendants' only generically described "furtive movements"; however, for all the reasons already discussed above, neither the purported "erratic driving" nor the unspecified "furtive movements" supports reasonable, articulable suspicion to extend the initial stop even when considered collectively under the totality of the circumstances.

Second, any suspicion associated with the non-immediate stop by the Acadia after Officer Burns activated his emergency lights is greatly diminished by Officer Burns' further testimony that when he activated his emergency lights the male driver rolled down the window; the male driver pointed at the parking lot of the Southview Apartments; Officer Burns interpreted this pointing to suggest the male driver was going to "pull in the Southview Apartments"; the male driver turned into the Southview Apartments parking lot; and the male driver parked in a parking spot at the Southview Apartments. (Tr. 76–77).

Notably, this is not a case in which the evidence establishes that when the officer activated his emergency lights the driver drove a great distance before stopping, nor is this a case in which the driver drove off in an attempt to evade law enforcement. Cf., United States v. Oliver, 550 F.3d 734, 736 (8th Cir. 2008); United States v. Smith, 990 F.3d 607, 610 (8th Cir. 2021), reh'g denied (Apr. 27, 2021). Instead, in this case we have a vehicle which failed to "immediately stop" with no real testimony as to how long the vehicle took to stop after Officer Burns activated his emergency lights. Here again, to accept this assertion of a non-immediate stop lasting a limited, unspecified (and irreconcilable) amount of time differing somewhere between a "matter of seconds" and a "matter of minutes" as a sufficient basis to find the existence of reasonable, articulable suspicion would wholly eviscerate the "articulable" requirement of this standard.[12]

For the reasons discussed herein, the Court finds that law enforcement officers lacked reasonable, articulable suspicion to extend the stop of the Acadia beyond the moment in time when Officer Burns immediately upon approaching the vehicle realized the male driver was not

---

[12] A vehicle which travelled for a "matter of seconds" is entirely consistent with, and not unusual, where as Officer Burns testified he believed the Acadia driver signaled his intent to pull into the adjacent apartment complex parking lot; which the driver in fact did. In contrast, a vehicle that continued to drive for a "matter of minutes" would have continued on for a quite substantial distance, and could not have pulled into the apartment building parking lot which was adjacent to where Officer Burns activated his emergency lights.

Mr. Lemmons—this even before Officer Burns had fully arrived at the driver's window of the Acadia.[13] Because of the immediate nature of Officer Burns' realization regarding his mis-identification of the male driver and the lack of any separate reasonable, articulable suspicion to extend the initial stop beyond its original scope, all evidence obtained from the GMC Acadia was impermissibly obtained, including the "smoking pipe" the officers observed in the map compartment of the Acadia's passenger door and all evidence subsequently seized from all above-referenced searches of the GMC Acadia.

The search of the Acadia is not saved by the April 20, 2021, Search Warrant because the April 20, 2021, Search Warrant is wholly based on information obtained as a result of the impermissible extension of the April 20, 2021, stop of the Acadia and on evidence obtained during that impermissible extension.[14] "The independent source doctrine allows admission of 'evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality.'" United States v. Green, 9 F.4th 682, 693 (8th Cir. 2021) (quoting United States v. Anguiano, 934 F.3d 871, 874 (8th Cir. 2019)). To satisfy the independent source doctrine, the Government must demonstrate "(1) that the decision to seek the warrant was independent of the unlawful entry—i.e., that police would have sought the warrant even if the initial entry had not occurred—and (2) that the

---

[13] The present case is distinguishable from other cases in which the Eighth Circuit Court of Appeals has held a reasonable suspicion existed to support the extension of a traffic stop after officers learned that "the subject of an outstanding warrant associated with the car was not present." See, United States v. Collier, 419 F. App'x 682, 685 (8th Cir. 2011). For example, in Collier, the Court noted that although the officer stopped the vehicle only because the vehicle was associated with the subject of an outstanding arrest warrant and had determined during the stop that said person was not in the vehicle, the officer had reasonable suspicion to extend the traffic stop because, among other things, he recognized the vehicle's occupant from previous narcotics encounters for which the occupant had been arrest. See, Id. The officer also "testified regarding his knowledge 'that narcotics are often associated with weapons.'" Id. Thus, the Court held that the officer could permissibly extend the stop based on his reasonable, articulable suspicion that Collier posed a threat to officer safety. Id. There are no such analogous facts in the record of this case.

[14] The affidavit in support of the April 20, 2021, search warrant application does contain a summary of law enforcement's interview with Defendant Skarja which occurred after Defendant Skarja had been taken into custody following the April 20, 2021, stop of the Acadia. However, this interview was only possible because of the impermissible extension of the April 20, 2021, initial stop of the Acadia which resulted in Defendant Skarja's arrest.

information obtained through the unlawful entry <u>did not affect</u> the magistrate's decision to issue the warrant." <u>United States v. Green</u>, 9 F.4th 682, 693 (8th Cir. 2021) (emphasis in <u>Green</u>) (quoting <u>United States v. Khabeer</u>, 410 F.3d 477, 483 (8th Cir. 2005)). The independent source doctrine is plainly not met in the present case.

Here, the record is devoid of any indication that any law enforcement officer would have sought a warrant to search the Acadia if Officer Burns had properly concluded the stop of the Acadia when he immediately realized the male driver was not Mr. Lemmons as he had believed and which was the reason for Officer Burns to initiate the stop of the Acadia. There is, however, every indication in the record that the unlawful extension of the April 20, 2021, stop affected the magistrate's decision to issue the April 20, 2021, Search Warrant because the affidavit in support of the April 20, 2021, Search Warrant is wholly based on information flowing directly from the improper extension of the stop of the Acadia.

Therefore, to the extent Defendants' Motions to Suppress seek the suppression of all evidence obtained <u>after</u> Officer Burns realized the scope of his initial investigatory stop was ended because the male driver was not Mr. Lemmons, the undersigned recommends that Defendants' Motions to Suppress, [Docket Nos. 48, 52], be **GRANTED**.

### III.    Conclusion

Therefore, based on the foregoing and all the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED THAT**:

1.  Defendant Fickas' Motion to Suppress, [Docket No. 48], be **GRANTED**, as set forth

    herein; and

2.  Defendant Skarja's Motion to Suppress, [Docket No. 52], be **GRANTED**, as set forth

    herein.


Dated: February 11, 2022                                    s/ Leo I. Brisbois
                                                      Hon. Leo I. Brisbois
                                                      U.S. MAGISTRATE JUDGE


### N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.